1

2

3

4

5

6

7

8

9           IN THE UNITED STATES DISTRICT COURT

10              FOR THE DISTRICT OF OREGON

11 MICHELE NOYES,                     )
                                      )
12          Plaintiff,                )   Civil No. 03-1651-HU
                                      )
13      vs.                           )
                                      )
14 JO ANNE BARNHART,                  )  FINDINGS AND RECOMMENDATION
   Commissioner of Social Security,)
15                                    )
            Defendant.                )
16 _____)

17 Alan Stuart Graf
   Amy Van Horn
18 1020 S.W. Taylor Street, Suite 370
   Portland, Oregon 97205
19
        Attorneys for plaintiff
20
   Karin Immergut
21 United States Attorney
   District of Oregon
22 Craig J. Casey
   Assistant United States Attorney
23 888 S.W. Fifth Avenue, Suite 1000
   Portland, Oregon 97204-2024
24
   Jeffrey Baird
25 Special Assistant United States Attorney
   701 Fifth Avenue, Suite 2900 MS/901
26 Seattle, Washington 98104

27      Attorneys for defendant

28 HUBEL, Magistrate Judge:


1 - FINDINGS & RECOMMENDATION

Michele Noyes brought this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for disability insurance benefits.

## Procedural Background

Ms. Noyes filed protectively on November 14, 2000 and on April 30, 2001. The applications were denied initially and upon reconsideration. A hearing was held on November 21, 2002. On April 25, 2003, the Administrative Law Judge (ALJ), Riley J. Atkins, issued a decision finding Ms. Noyes not disabled. The ALJ's decision became that of the Commissioner after the Appeals Council denied Ms. Noyes's request for review.

## Factual Background

Born June 11, 1944, Ms. Noyes was 58 years old at the time of the hearing. She has a high school education and an extensive work history, including 20 years as a secretary and a briefer period as a travel agent. She alleges disability since May 5, 1999, based upon fibromyalgia, lumbar degenerative disc disease, depression, interstitital cystitis, tendonitis, degenerative joint disease, irritable bowel syndrome, and diverticulitis.

## Medical Evidence

On March 20, 1995, Ms. Noyes was seen at Clackamas County Mental Health Center for a psychiatric evaluation. Tr. 251-254. The examiner was Bethany Rowland, psychiatric mental health nurse practitioner. Ms. Noyes gave an extensive verbal history. There is nothing to suggest Nurse Rowland had any records to verify this history. Indeed, Ms. Rowland felt it would be very useful to have

medical and psychiatric records and verify her health status. It does not appear this was done. Tr. 254. Ms. Noyes presented with complaints of recurrent depression that had existed since her early 20s and had worsened over the previous few months. Tr. 251. Ms. Noyes endorsed symptoms such as poor sleep with frequent awakening, a variable appetite, decreased attention and concentration, hopeless and helpless feelings, frequent episodes of crying, decreased energy, anhedonia, irritability, anxiety with a racing heart and occasional nocturnal awakenings in a panic state, and, finally, suicidal ideation with a "vague plan either to shoot herself, run her car off the road, or overdose." Tr. 251. Ms. Noyes denied any intent to follow through with these thoughts. Id.

Ms. Rowland noted that Ms. Noyes reported being currently under a "great deal of stress," including placing her 96-year-old grandmother into a nursing home. Ms. Noyes reported that her grandmother was resistant and that she felt guilty because although she had cared for her grandmother for three years following a stroke, it had become too difficult for Ms. Noyes to continue. Id. In addition, Ms. Noyes's mother, "with whom she has a poor relationship," was arriving from West Virginia to help with the grandmother's placement. Ms. Rowland wrote, "This client feels a tremendous amount of tension with her mother and is anticipating problems." Id. Ms. Noyes reported that she was on the verge of being left by her companion of over 20 years, unemployed, and unable to work because of depression. Id.

Ms. Noyes reported one or two times in her life when she had abused alcohol and street drugs. The first time was in 1973, when she was 29, and was occasioned by the death of her father, to whom

3 - FINDINGS & RECOMMENDATION

she was very close, a total hysterectomy, and a divorce. Tr. 252. At that time, she drank tequila to excess. Id. Ms. Noyes resumed heavy drinking after the death of her son in a motor vehicle accident, but she was able to stop drinking with the use of transcendental meditation. Id. Ms. Rowland wrote, "In terms of street drug use, she endorses using 'anything' because she was constantly partying for several years following her divorce in 1973." Id. She denied any current drug use. Id.

Ms. Noyes stated that she had been hospitalized on several occasions for depression, and had participated in several courses of outpatient therapy. Tr. 252. The first hospitalization occurred in Texas, where she was raised, when she was 20 years old and overdosed on medication. Id. In 1978, she "may have been" hospitalized for depression, after her son's death.[1] Ms. Noyes stated that she was hospitalized at St. Vincent's again in 1985, for depression, and in 1993, at age 48, she was voluntarily admitted to Woodland Park Hospital for depression with suicidal ideation. Id. She was seen at Clackamas County Mental Health between 1990 and 1992, during which time she was given several medication trials. Tr. 253.

Ms. Noyes said she had tried numerous antidepressants, including Zoloft, Lithobid, Doxepin, Welbutrin, Pamelor, Trazadone, Visteril, phenobarb, Tegretol, Imipramine, Navane, Calan, and Benadryl. Tr. 253. She said none had been very successful, as they made her feel either agitated or too sedated. Id.

Ms. Noyes said she had been married and divorced twice, both

---

[1] It appears that Ms. Noyes's son was born in 1976. Tr. 207.

4 - FINDINGS & RECOMMENDATION

to men who were reportedly abusive and alcoholic. Tr. 253. She was currently in a 20-year relationship with a partner, which was not going well. Id. Ms. Rowland's diagnosis was major depression, recurrent. Tr. 254.

On August 7, 1995, Ms. Noyes was seen by Howard Gandler, M.D., a rheumatologist, for steadily worsening fatigue of approximately nine months' duration. Tr. 157. She complained of pain in her knees, neck, back, shoulders, arms, hands, groin, thighs, knees, calves, arches, feet, and toes. She also reported headaches which paralleled the neck pain in intensity, and said she was "never pain-free." Id. The pain was worst in the morning and at night, but was never associated with swelling or redness. Id. Her sleep was poor. Id.

Ms. Noyes reported that she had been on numerous antidepressants and nonsteroidal anti-inflammatory drugs (NSAIDs) in the past. Vicodin was effective for less than two hours. Heat and ice were also ineffective. Id. She was continuing to see her chiropractor for old low back pain. Id. Upon examination, she had small joint tenderness, but no other evidence of arthritis, and extensive soft tissue tenderness. Dr. Gandler observed that her symptoms, along with the absence of positive laboratory results, were most consistent with fibromyalgia. Tr. 158. While he concluded that Ms. Noyes met the diagnostic criteria for fibromyalgia, he failed to document that diagnosis in the record. Id. Dr. Gandler thought it possible that Ms. Noyes's symptoms were caused by depression, although he questioned it. He thought it worth investigating, however. Id. Dr. Gandler ordered some tests, wanted her records to review, and suggested a fibromyalgia support group.

5 - FINDINGS & RECOMMENDATION

*Id.* Ms. Noyes has not submitted records indicating whether the testing was done, the records obtained, or the support group attended. There is a gap of 4 ½ years in the medical records.

On February 23, 2000, Ms. Noyes was examined at Oregon Health Sciences University (OHSU) by Atul Deodhar, M.D., another rheumatologist, on referral from Dr. Hendin. Tr. 272-74. There are no records from Dr. Hendin. Ms. Noyes complained of generalized aches and pains starting in 1994. Tr. 272. At that time she lost 10 pounds over a one year period and was diagnosed with diverticulitis and irritable bowel syndrome, confirmed by upper and lower GI endoscopy. *Id.* Dr. Deodhar noted that Dr. Gandler had treated Ms. Noyes for fibromyalgia with Neurontin, NSAIDs, and other medications. *Id.* There are no records of this treatment, or confirmation from Dr. Gandler.

Ms. Noyes reported that over the past two years her aches and pains had further worsened, and said she had palpitations, depression, and sleep disturbances. *Id.* She said she was unable to eat sugar, milk, and beef products because they give her abdominal pain, nausea and diarrhea. Dr. Deodhar noted that Ms. Noyes reported a great deal of situational stress during the previous eight or nine years, including caring for her grandmother, the death of her grandmother, litigation with her mother over the grandmother's estate, and breaking up with her companion of 25 years. *Id.*

Review of systems was significant for chest wall pain, frequent headaches, muscle weakness, muscle pain, depressed moods, anxiety, excessive fatigue, poor sleep pattern, and fatigue upon awakening. Tr. 273. She also reported crampy abdominal pain and

6 - FINDINGS & RECOMMENDATION

diarrhea, urinary tract problems, and difficulties with memory and comprehension. Id.

Upon examination she appeared "very depressed and subdued." Id. Dr. Deodhar described her as "very thin," with a weight of 124. Id. She had a goiter that was soft and non-nodular, with a smooth surface; it was mildly tender. Id. She reported that she had been seen in the past by an endocrinologist. She had 16 out of 18 tender points of fibromyalgia, as well as some nodal osteoarthritis. Id. Although she had full range of movement in the joints, she had hypermobility with 15 degrees of extra extension possible at the elbows. Id. There was some tenderness in bilateral iliac fossas suggestive of irritable bowel syndrome. Id.

Dr. Deodhar diagnosed fibromyalgia, depression, nodal osteoarthritis, and benign goiter. Tr. 273-74. He discussed with Ms. Noyes fibromyalgia treatment strategies, such as physical therapy, occupational therapy, psychotherapy, trigger point injections, and drug therapy, telling her that physical and occupational therapy are an integral part of the treatment of fibromyalgia. Tr. 274. There is some evidence that Ms. Noyes followed through with physical and occupational therapy in 2001. Tr. 168-77.

Dr. Noyes also recommended that she see Carol Burckhardt, R.N., Ph.D.,[2] a mental health nurse practitioner, for her depression and anxiety, "which are clearly fueling her fibromyalgia." Id. Dr. Deodhar ordered x-rays of her low back and

---

[2]Ms. Burckhardt's Ph.D is in nursing and she is a professor. Tr. 189, 274.

7 - FINDINGS & RECOMMENDATION

pelvis and blood tests to rule out any other inflammatory arthritis or significant degenerative arthritis; he also suggested that she see an endocrinologist for further investigation of the goiter. Id. An MRI taken that day showed moderate degenerative disc disease at L1-2 and L5-S1 and degenerative facet joint sclerosis. Tr. 183.

On March 16, 2000, Ms. Noyes saw Ms. Burckhardt. Ms. Burckhardt recorded that Ms. Noyes's problems included lack of social support, multiple unresolved losses, persistent, unrelieved pain, and depressed mood. Tr. 191. Ms. Noyes reported that she had moved to the beach two years previously, although she did not want to move and gave up a good job. Tr. 190. Ms. Noyes reported attending restorative yoga sessions twice a week and walking. Tr. 191. Ms. Burckhardt's diagnosis was adjustment disorder with mixed emotional features due to breakup of relationship. Id. The treatment plan discussed at that time was better pain control, trying to find a newer antidepressant, and giving herself "time to come to grips with finality of relationship breakup before decid[ing] what to do next." Id.

Ms. Noyes filled out a Fibromyalgia Impact Questionnaire on March 16, 2000, apparently for Ms. Burckhardt. Tr. 192-93. Ms. Noyes did not identify any activity that she was not normally able to do except yard work. Tr. 192. Over the previous week, she reported being able to visit friends or relatives "most times" and being able to shop, wash dishes by hand, and walk several blocks frequently. Id. She also endorsed very severe pain, feeling very tired, awaking very tired feeling very stiff, very anxious, and very depressed. Tr. 191.

Ms. Noyes was seen by Martin M. Klos, M.D., a pain specialist,

8 - FINDINGS & RECOMMENDATION

on April 11, 2000. Tr. 201. Her chief complaint was low back pain, but she also complained of pain and stiffness over the back, neck, shoulders and head. Id. Ms. Noyes told Dr. Klos that standing, sitting and exercise worsened her low back pain, and that heat, massage, meditation, yoga and pain medication made it better. Id. Dr. Klos wanted to see Ms. Noyes's records from Dr. Hendin, Tr. 200, but there is no indication that he ever got those records.

Dr. Klos's behavioral assessment was that Ms. Noyes's mood, interest level, energy, and spirits were low; that her sleep pattern showed dysomnia; that she had suicidal ideation; and that her memory was good for time, place, person, event, past, names and numbers. Tr. 203.

Various tests for assessing cervical pain were positive. Tr. 204-05. Eighteen out of eighteen tender points were positive for pain. Tr. 205-06. Dr. Klos discussed with Ms. Noyes the evidence of degenerative disc disease in the lumbar and cervical spine and of secondary fibromyalgia. Tr. 206. Dr. Klos's diagnoses were cervicalgia, degeneration of lumbar or lumbosacral intervertebral disc, and myofascial pain syndrome. He recommended that she change medication to Norco for pain control, continue with physical therapy, and consider spiritual counseling. Id.

On May 2, 2000, Ms. Noyes saw Dr. Deodhar again. Tr. 181. Her primary complaints were depression and fibromyalgia. Id. She related that she lived alone in Lincoln City and had no social support, no employment, and no local friends. Id. Since her last visit, she had undergone physical and occupational therapy assessments and learned strategies for relieving stress. Id. Upon examination, her weight was 125 pounds. Musculoskeletal examination

9 - FINDINGS & RECOMMENDATION

showed "fairly good" range of motion in the shoulders, neck, hips, knees and ankles. She had no evidence of inflammatory arthritis. Id.

Ms. Noyes was seen by Dr. Deodhar on July 20, 2000 for fibromyalgia, depression and a possible thyroid adenoma. Tr. 179. Dr. Deodhar noted that she had a small nodular lesion in the left lobe of the thyroid which was cystic, and that she would be undergoing a biopsy and aspiration of this lesion soon. Id. Her weight was 120.6 Id. Current medications were oxycodone, Ambien, and Klonopin. Ms. Noyes reported she wanted to find a job as soon as possible. She was doing a special type of yoga she learned in Hawaii. Tr. 179. Upon examination, she had 13 out of 18 tender points of fibromyalgia and was also tender on the spinous processes in the thoracic and cervical spine. Id. She had no evidence of inflammatory synovitis in any of her joints and had normal joint movements. Id. Dr. Deodhar added Celexa to her drug regimen. Id.

Ms. Burckhardt's treatment notes for September 14, 2000, record that Ms. Noyes described depressive feelings, crying, inability to get motivated, and anger. Tr. 188. She reported suicidal thoughts, but no plan and said she had "felt this way after son's death several years ago." Id. Ms. Burckhardt wrote that Ms. Noyes's affect was "very lonely, depressive symptoms prominent." Ms. Burckhardt revised her diagnosis to major depressive disorder and prescribed Celexa. Id.

Ms. Noyes returned later in the month describing severe side effects from Celexa including nausea, dizziness, and feelings of dissociation. Id. Ms. Burckhardt noted that Ms. Noyes "has felt immobilized - not able to contact temp agencies although she thinks

10 - FINDINGS & RECOMMENDATION

getting a job is a first priority." Id. Ms. Burckhardt observed that she was tearful at times, but able to concentrate on the conversation. Id.

Ms. Noyes saw Dr. Deodhar on September 21, 2000. Tr. 178. Dr. Deodhar noted that she was taking high doses of oxycodone and Norco, and that the pain clinic doctor had recently put her on morphine. Id. However, Dr. Deodhar observed, "Despite being on high doses of narcotic analgesics, she is now still having a lot of pain, and I have warned her that these drugs do produce dependence [and] ... tolerance." Id. Upon examination, Ms. Noyes's weight was 116.2. She had evidence of fibromyalgia with multiple tender points, but without swelling or synovitis.

On October 5, 2000, Ms. Noyes saw Ms. Burckhardt, who found her "smiling more today," with "depressive symptoms somewhat decreased." Tr. 188. On October 19, 2000, Ms. Noyes reported to Ms. Burckhardt being "very stressed and tired" because she had been doing "temp agency testing all week." Tr. 187. She said she was very worried about finding a job and running out of health insurance, and angry at her ex-partner. Id. Ms. Noyes said she was able to motivate herself to get up and job hunt, and that she was working with an occupational therapist on job-related skills. Id.

On October 23, 2000, Dr. Klos noted that a dexterity test given to Ms. Noyes at Vocational Rehabilitation had set off wrist pain. Tr. 197. Upon examination, she had positive Tinel's sign on the left and positive Phalen's test,[3] as well as decreased range of

---

[3] Tinel's sign and Phalen's test are used to make a diagnosis of carpal tunnel syndrome. Phalen's test is done by pushing the backs of the hands together to compress the carpal

11 - FINDINGS & RECOMMENDATION

motion of the neck in all directions. Id.

On December 7, 2000, Ms. Noyes reported to Ms. Burckhardt that she had had a full-time job in data entry for two weeks, but quit because she couldn't tolerate sitting at a computer all day and could not do it full-time. Id. Ms. Burckhardt wrote that Ms. Noyes had "applied for several more jobs but worries about being able to work more than part-time." Id. She was "expressing feelings of great loneliness, sadness, tearful during session." Id.

On January 5, 2001, Ms. Noyes reported to Ms. Burckhardt that the holidays had been difficult. Ms. Burckhardt wrote, "Affect is very flat, little motivation to talk about new possibilities. Is doing work rehab and looking at jobs. Has two interviews scheduled." Ms. Burckhardt noted, "Depressive symptoms prominent now but related to grieving process around end of relationship." Id.

On January 29, 2001, Dr. Klos wrote that he had discussed with Ms. Noyes the possibility of a surgical procedure for her back. Tr. 196. Tr. 196. He noted that analgesics were not "covering all pain," but that they had made Ms. Noyes more functional.

On February 2, 2001, Ms. Noyes reported to Ms. Burckhardt that she had a job interview the next day, about which she was "feeling positive." Tr. 187. Her mood was more positive and hopeful and she described a man she had met in November. Id. Her depressive symptoms were "much decreased." Id.

tunnel. Tinel's sign is elicited by tapping the median nerve along its course in the wrist to determine whether it causes pain, tingling or numbness in the fingers. See SH Kuschner et al., Tinel's Sign and Phalen's Test in Carpal Tunnel Syndrome, 11 Orthopedics 1297-302 (1992).

On March 30, 2001, Ms. Noyes began working with a consultant from Workforce Dynamics, Denise Arvidson, to assist in job placement activities. Tr. 74. Ms. Arvidson reported that Ms. Noyes had attended an orientation and completed the paper work to work with Goodwill Staffing Services, but declined the opportunity to work as a concierge at a federal building downtown through Portland Habilitation Center because it was "not a job with which she would feel comfortable." Id. She also declined to follow up on a retail merchandiser position that involved working the night shift, because of her problems with insomnia. Id. She interviewed for a job with Clark Craft Warehouse for a floral designer position, but was not hired. She did not apply for a position as a sales associate at the Craft Warehouse because it required being on her feet all day and working weekends. Id.

Ms. Arvidson reported that Ms. Noyes contacted first Unitarian Church, Choctaw Management, Cybersight, Adidas, National Relief Charity, Multnomah County Sheriff's Office, Susan Komen Breast Cancer Association, Harley-Davidson, Lewis & Clark College, Hertz Corporation, Oregon Education Association, Poppy Box Gardens, Colette Tours, Bethany Village, Rose Quarter, U.S. Courts, Art Institute of Portland, Blount Industries, Northwest Regional Lab, Oregon Arena Corporation, Oregon Historical Society, Triangle Travel, Davis & Bancleas PC, McMenamins, and a bankruptcy lawyer. Ms. Arvidson wrote, "Michelle is being selective about the types of jobs for which she is willing to apply. She is seeking part-time, approximately 30 hours a week, and would like to work in a creative artistic environment and preferably would like to earn a minimum of $10.00 an hour." Id.

13 - FINDINGS & RECOMMENDATION

On April 17, Ms. Arvidson reported that Ms. Noyes had worked one day for Goodwill Industries and had two interviews for clerical positions with Beaverton Chiropractic and a national charity. Tr. 73. She was at that time working nine days as a movie extra, earning $50 per day. The consultant had given her information and an application for a data entry position from the home with Scan One Network, and the consultant reported that Ms. Noyes was "quite excited about this." Ms. Noyes thought she could work at two part-time jobs, one at home such as data entry and one outside the home, because data entry at home "would not be a problem as she could take frequent breaks."

On April 21, 2001, Ms. Arvidson reported that Ms. Noyes had obtained a clerical position with National Relief Charities and would be starting work on May 1. The hours were 16-18 hours per week, at a wage of $10 per hour. Tr. 71. She had also completed an application for an at-home data entry position. Id. Ms. Arvidson also suggested that Ms. Noyes consider taking a class in medical terminology so that she could work for a medical transcription firm on an independent contractor basis. Id.

Ms. Arvidson arranged an interview for Ms. Noyes at Beaverton Chiropractic, for a part-time reception position. She also contacted a number of other potential employers. Id.

On April 24, 2001, Ms. Noyes reported to Dr. Klos that she was working 16 hours a week doing payroll and bookkeeping, but was experiencing high pain levels and had had a flare in pain the previous week. Tr. 195. Most of the pain was in her back and neck, with peripheral myofascial pain. Id.

An MRI done on May 9, 2001, showed mild lumbar dextroscoliosis

14 - FINDINGS & RECOMMENDATION

with L5-S1 degenerative disc disease, mild right neuroforaminal stenosis and right lateral recess stenosis and two liver lesions. Tr. 166-67.

On May 15, 2001, Sue Ferguson of Workplace Dynamics reported on an evaluation of ergonomic needs for Ms. Noyes at her employer's office. Tr. 70. She recommended a wrist rest, a stand-up document holder, and a tilt-adjustable footrest. Id. However, Ms. Ferguson thought her chair did not fit her physique. Id.

On May 16, Ms. Ferguson wrote a follow-up letter about Ms. Noyes's ergonomic needs at work. Tr. 67. She reported that Ms. Noyes was working three days a week for a total of approximately 20 hours a week. Ms. Ferguson repeated her views that Ms. Noyes required a wrist rest, a document holder, and a footrest, and stated her opinion that the chair Ms. Noyes was using did not provide sufficient lumbar and cervical support and there were no other chairs available to her. Id.

On June 17, 2001, Ms. Noyes presented at the emergency room for evaluation of depression and for complaints of chest pain and chronic abdominal pain. Tr. 185. Examination was normal. Id.

In August 2001, Social Security consultant, Martin Lahr, M.D., a pediatrician, and Linda Jensen, M.D., a physical medicine specialist, performed a records review. They agreed with diagnoses of fibromyalgia and degenerative disc disease at L5-S1, but found only minor physical limitations and no psychological or mental limitations. Tr. 225-236. They concluded that Ms. Noyes had the ability to lift 20 pounds occasionally and 10 pounds frequently; to stand about six hours and sit about six hours out of an eight-hour workday; climb, balance, stoop, kneel crouch and crawl

15 - FINDINGS & RECOMMENDATION

occasionally; and be exposed to any work environment except extreme cold. They noted,

> Indications are the c/o [complaints] are affected by break-up of relationship, lack of work and depression. Her c/o are more severe than what she actually states she does on fibromyalgia questionnaire on 3/00. She notes she occasionally does laundry, prepares meals, vacuums, makes the bed. She visits friends, does shopping, walks on the beach, takes yoga and attends PT and OT.

Tr. 231.

On August 15, 2001, Dick Wimmers, Ph.D., a psychologist, performed a records review assessment for the period April 1, 2000 to September 30, 2000. Tr. 212-225. Dr. Wimmers completed a form entitled "Psychiatric Review Technique," checking boxes under the heading "Medical Disposition" that were labeled "Coexisting Nonmental Impairment(s) that Requires Referral to Another Medical Specialty" and "Insufficient Evidence."

Under the heading "Category(ies) Upon Which the Medical Disposition is Based:" Dr. Wimmers checked a box labeled "Affective Disorders" and wrote next to it, "adjustment d/o with mixed emotional features." Tr. 212. The other 13 pages of the form were left blank. Dr. Wimmers's findings were affirmed as written by Peter LeBray, Ph.D. Tr. 212.

On August 22, 2001, Ms. Noyes was seen by Dr. Klos, to review pain relief medications. Tr. 194. Ms. Noyes told Dr. Klos her pain was worse, but she wanted to decrease, and eventually stop, the morphine she was receiving through the Duragesic patch. Id. They discussed substituting methadone, but it was decided to substitute oxycontin. Id.

On December 4, 2001, Ms. Noyes consulted MaryJane Munger, Licensed Professional Counselor. Ms. Noyes complained of chronic

16 - FINDINGS & RECOMMENDATION

depression, with symptoms of lack of motivation, tearfulness, insomnia, suicidal ideation, decreased appetite, and memory lapses. Tr. 240. Ms. Munger observed that Ms. Noyes's appearance was slumped and her psychomotor activity retarded. Her affect was restricted. Id. Ms. Noyes reported four previous hospitalizations for depression and suicidal ideation, with the most recent hospitalization being in 1995. Tr. 241. Ms. Munger recommended individual therapy to address depression, pain management skills, and grief and loss issues. Id.

On December 19, 2001, Ms. Noyes was given a psychological evaluation by Rory F. Richardson, Ph.D. Tr. 207-211. Her presenting problem was depression, pain all over her body, and loss of appetite. Tr. 207. Ms. Noyes reported that she had "problems back in her 20s," relating to the loss of her father, hysterectomy and a divorce, all in the same year. Id. Ms. Noyes said she had suffered from severe depression, suicidal tendencies, and "had problems several times with issues relating to her son." Id. She said he had been hospitalized in the 1970s in Houston, Texas, again in 1978 at St. Vincent's Hospital and again in 1985. She was also hospitalized in 1993 at Woodland Park Hospital. Id. She had been in counseling at Clackamas County Mental Health and with various counselors throughout the years, being currently in counseling with Mary Jane Munger. Id.

Ms. Noyes said her father had been in the military and her parents were gone a great deal, so that she was sent to live with grandmothers at various times. Id. Discipline within the family was "very strict," with verbal and physical abuse by her mother, the latter consisting of "locking her in the bathroom for hours on

17 - FINDINGS & RECOMMENDATION

end." <u>Id.</u> She also reported some learning problems. <u>Id.</u> She reported that during her childhood, her mother had numerous affairs and "there was a great deal of yelling between her mother and her father during childhood years." <u>Id.</u> Ms. Noyes reported being married and divorced twice, and having two children, a daughter and a deceased son. <u>Id.</u>

Mental status examination revealed psychomotor movements suggestive of fatigue with mild grimacing indicating some specific joint pain and difficulty with movement. Tr. 209. Overall psychomotor movement was relatively limited with indicators suggestive of chronic pain. <u>Id.</u> She performed serial sevens with substantial difficulty and was able to remember only two of four unrelated words over a five-minute period. <u>Id.</u> Affect appeared to suggest fatigue and depression, with the depression appearing to be relatively chronic. <u>Id.</u>

Dr. Richardson administered several diagnostic tests. The Wide Range Achievement Test (WRAT) showed reading and spelling at post-high school level, and arithmetic at fifth grade level. <u>Id.</u> T h e Wechsler Adult Intelligence Scale III (WAIS-III) showed average full-scale IQ. The Minnesota Multiphasic Personality Inventory-2 (MMPI-2) showed a valid profile. Tr. 210. The level of depression was severe. <u>Id.</u> There was specific notation suggestive of concomitant obsessive-compulsive symptomatology with intense rumination. Social isolation was also noted. Her level of anxiety was severe. <u>Id.</u> Her level of mood disturbance appeared to be severe enough to interfere with work. <u>Id.</u> Interference in family and social interaction was also noted with indicators of social discomfort and low self-esteem. <u>Id.</u>

18 - FINDINGS & RECOMMENDATION

Dr. Richardson concluded, "The responsiveness to treatment is questionable in that there are several negative treatment indicators noted. In reference to personality patterns, passive-aggressive and schizotypal personality traits were noted along with avoidant and schizoid patterns." Id.

Dr. Richardson thought testing indicated posttraumatic stress symptomatology. Id. He thought her level of depression was "severe enough that it is unlikely that she would be able to effectively function within the workplace during this time." Id. He also found substantial indications of "ruminating over issues and a concomitant anxiety disorder most likely congruent with obsessive-compulsive patterns." Id.

Dr. Richardson's Axis I diagnoses were: major depressive disorder, recurrent, severe without psychotic features; anxiety disorder, Not Otherwise Specified (NOS), Dyssomnia, NOS, and pain disorder associated with psychological factors and a general medical condition. Tr. 211. He also diagnosed passive-aggressive and isolative traits. Id. He assessed her Global Assessment of Functioning (GAF) at 30. Id.[4]

On January 2, 2002, Dr. Richardson completed a form generated by the State of Oregon called Rating of Impairment Severity. Tr. 237. He noted that Ms. Noyes had "marked" restrictions in activities of daily living, "moderate" restrictions in social

---

[4] The GAF scale assesses psychological, social and occupational functioning on a hypothetical continuum of mental health - illness. A GAF between 21 and 30 indicates serious impairment in communication or judgment or inability to function in almost all areas. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 4th ed. Text Revision, p. 34.

19 - FINDINGS & RECOMMENDATION

functioning, "frequent" deficiencies of concentration, persistence and pace, and "frequent" episodes of deterioration in work and work-like settings. Tr. 237-38. In a statement that should be accorded the weight of a reviewing doctor's opinion, he further stated that he estimated the date of onset "between 1970s and 1985 with continued impair[ment]," and that he expected the condition to last at least 12 months. Tr. 238. In his opinion, her prognosis was "guarded." Id.

On March 20, 2002, Myra Thompson, Family Nurse Practitioner, recorded that Ms. Noyes's regular medication regimen included a Duragesic patch, 100 mg; Norco; Ambien for insomnia; Marinol for nausea; and Soma. Tr. 242.

On November 4, 2002, Dr. Klos wrote that he had been treating Ms. Noyes since April 2000, seeing her every three months. Tr. 247. He related that Ms. Noyes had come to him with complaints of pain and stiffness in her low back, neck and shoulders, and that her current diagnoses were cervicalgia and probable degenerative disc disease in the cervical spine, degeneration of the lumbar intervertebral disc, and myofascial pain syndrome. Id. He opined that her conditions were "bad enough to contribute to a chronic pain syndrome, but not severe enough to warrant surgery." Id. Dr. Klos stated further that Ms. Noyes had been compliant with treatment and that she was "very credible in her complaints." Id. Dr. Klos felt that "the overwhelming problems for her come from her disease process, not her treatment." Id. In Dr. Klos's opinion, Ms. Noyes' next 12 months would consist of "continued back, neck and body pain," and he expected her to need to continue pain medication in order to perform activities of daily living. Id.

20 - FINDINGS & RECOMMENDATION

He stated that she would have "trouble lifting and carrying articles over 10 pounds in weight regularly," and that he had recommended that she change position frequently throughout the day, at least every 20 minutes. Tr. 248. Dr. Klos added that because of her sleep problems, all of Ms. Noyes' bodily and mental functions were affected, and this, along with depression, caused her to have decreased performance. Id. In his opinion, medication reduced her pain approximately 25 to 50%, which meant that the "patient continues to deal with a very high pain load, continually marshaling [her] dwindling mental resources just to get through the day." Id.

## Hearing Testimony

Ms. Noyes testified at the hearing that Dr. Klos started her on pain medications immediately after her first visit in April 2000, tr. 298, but that he changed them often because "nothing seemed to work." Tr. 299. She testified that during that time, sitting for more than 15 minutes, standing and lifting made her pain worse. Tr. 300. She said that her pain levels have not improved since April 2000. Tr. 301. Ms. Noyes said that in April 2000, she was unable to vacuum, mop, sweep, or do laundry without assistance. Tr. 304. She was, however, able to go to the grocery store. Id. She testified that Dr. Deodhar had recommended Carol Burckhardt as a therapist. Tr. 308. The record reveals the referral was made because mental health issues were thought to be causally related to her fibromyalgia complaints. Tr. 274.

Ms. Noyes related several unsuccessful work attempts, including one day as a secretary, a part-time administrative assistant job with National Relief Charities that lasted

21 - FINDINGS & RECOMMENDATION

approximately three months, and a data entry job that lasted about two weeks, and which she was unable to do because of pain in her hands and wrists. Tr. 315-18.

The ALJ called a vocational expert (VE) Susan Burkett. Tr. 325. The ALJ asked her to consider a claimant with the residual functional capacity "as recited in Exhibit 9F (i.e., the findings of Doctors Lahr and Jensen). Tr. 333. The VE opined that such a person could return to her former work as a general office clerk, a semiskilled job involving light exertion. Tr. 336-337. The ALJ then asked about a claimant who "should avoid highly stressful, pressured work," tr. 336, who "should not be required to make substantial judgment decisions on the job, and should not be required to have repeated public contact." Tr. 339. The VE responded that this would preclude employment as a general clerk, because a general clerk is required to make "judgment calls." Tr. 339. The ALJ then amended his hypothetical to limitations on the ability to make "policy decisions," and "executive decisions," and the VE opined that such limitations would not preclude work as a clerk. Tr. 340-41.

Upon cross examination, the VE testified that a person who was required to be absent from the workplace an average of two or more days a month could not sustain employment. Tr. 341.

Ms. Noyes's attorney asked the VE to consider a person 56 years old with a high school education and Ms. Noyes's past relevant work experience who was able to do arithmetic at the fifth grade level, could lift no more than ten pounds and only five pounds frequently, able to have only limited interaction with the public, co-workers and supervisors, and whose ability to

22 - FINDINGS & RECOMMENDATION

concentrate was deteriorating. The attorney asked the VE additionally to consider someone who needed to get up and move around at will. Tr 342-45. The VE was unable to answer the question because the amount of moving around in a general clerk's job was too variable. Tr. 345. Ms. Noyes's attorney inquired whether in her previous clerical jobs, Ms. Noyes had been able to move around; she answered that she was essentially "behind a desk." Tr. 345. The VE's testimony in response to her counsel's questions neither helped nor hurt Ms. Noyes's case.

## ALJ's Decision

The ALJ found that Ms. Noyes's impairments included fibromyalgia, lumbar degenerative disc disease and "an adjustment disorder versus depression (due to breakup of relationship(s) during her insured period)." Tr. 24. He found further that Ms. Noyes had been diagnosed with fibromyalgia in 1995, "thus showing she has carried this diagnosis for a long period of time." Tr. 28. The ALJ found that these impairments, in combination, were "severe" and "caused significant vocationally relevant limitations prior to her date last insured." Tr. 24.

The ALJ's finding that Ms. Noyes had an adjustment disorder was based on the opinion of a reviewing psychologist, Dick Wimmers, dated August 2001 and based on an assessment of her records from April 2000 to September 2000. Tr. 212. The ALJ rejected Dr. Richardson's findings and diagnoses because his evaluation occurred more than a year after Ms. Noyes's eligibility ceased, because he "relied primarily on claimant's subjective complaints," because the GAF Dr. Richardson assigned made it "seem[] unlikely she would be able to care for her basic needs, a fact not evident in this

matter," and because it was "clear from the record that her depression stemmed from a breakup of long-term relationship(s) with a boyfriend(s)." Tr. 24-25.

The ALJ noted evidence from Ms. Burckhardt that Ms. Noyes was "capable of work-related activities and, in fact, claimant had even told her she was willing to return to work." Id. The ALJ noted that these observations were made during the time that Ms. Noyes was eligible for disability benefits. The ALJ concluded that during Ms. Noyes's insured period, her alleged symptoms "only resulted in mild limitations in [activities of daily living] and social functioning and moderate limitations in concentration, persistence and pace." Id. The ALJ found that while Ms. Noyes "did have a severe adjustment disorder during her insured period, the evidence reveals it was not so severe as to keep her from performing work-related activities." Tr. 25.    The ALJ rejected the opinions of the treating rheumatologists, Doctors Gandlin and Deodhar, the treating pain specialist, Dr. Klos, and the examining psychologist, Dr. Richardson, relying instead on the opinions of the agency's non-treating, non-examining physicians, Dr. Jensen, a physical medicine specialist, Dr. Lahr, a pediatrician, and Dr. Wimmers, a psychologist.

The ALJ found Ms. Noyes's testimony not "entirely credible."

The ALJ accepted the RFC findings of Doctors Jensen and Lahr and concluded that Ms. Noyes was able to meet the exertional demands of light work, with some limitations. He concluded that she was able to return to her past relevant work of general office clerk from April 1, 2000 through September 30, 2000, when she was last insured for disability insurance benefits.

24 - FINDINGS & RECOMMENDATION

///

## Standard of Review

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. <u>Meanel</u>, 172 F.3d at 1113; <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and

25 - FINDINGS & RECOMMENDATION

laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If so, the claimant is conclusively presumed disabled. Yuckert, 482 U.S. at 141. If not, the Commissioner goes to step three.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, she is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, she is not considered disabled. Yuckert, 482 U.S. at 141-42.
///

26 - FINDINGS & RECOMMENDATION

**Discussion**

The issue presented by this case is whether Ms. Noyes has met her burden of proving disability between her alleged onset date, April 1, 2000, and her date last insured, September 30, 2000. She offers the following evidence:

The ALJ found, and the medical evidence demonstrates, that Ms. Noyes has had fibromyalgia,[5] perhaps since 1995. In February 2000, Dr. Deodhar diagnosed osteoarthritis, depression, and possible irritable bowel syndrome as well as fibromyalgia. The diagnosis of osteoarthritis is uncontradicted. The diagnosis of irritable bowel syndrome was confirmed by a GI series. Tr. 233.

In April 2000, Dr. Klos's examination revealed that tests for assessing cervical pain were positive and 18 out of 18 tender points were positive. Dr. Klos diagnosed cervicalgia, degeneration of lumbar or lumbosacral intervertebral disc, and myofascial pain syndrome.

---

[5] The symptoms of fibromyalgia are entirely subjective. Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir. 2001). The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms. Benecke v. Barnhart, 379 F.3d 587, 590 (9th Cir. 2004). There are no laboratory tests for the presence or severity of fibromyalgia. Rollins, 261 F.3d at 855. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and "the only symptom that discriminates between it and other diseases of a rheumatic character," multiple tender spots, more precisely, 18 fixed locations on the body, of which the patient must have at least 11 to be diagnosed with fibromyalgia. Id. See also Benecke, 379 F.3d at 590 (common symptoms of fibromyalgia include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with the disease.)

In October 2000, Dr. Klos noted clinical evidence of tendonitis in the left wrist and decreased range of motion of the neck in all directions.

Ms. Noyes's testimony was that none of her pain medications seemed to work, and that her pain levels had not improved since April 2000.

The countervailing evidence, on which the ALJ relied, comes from state agency reviewing physicians Jensen and Lahr.

Doctors Jensen and Lahr accepted the diagnoses of degenerative disc disease, fibromyalgia, tendonitis of the left hand, and irritable bowel syndrome. However, they thought Ms. Noyes's complaints exceeded the actual severity of her impairments. In their opinion, Ms. Noyes could lift 20 pounds occasionally and 10 pounds frequently, and could sit, stand, or walk for up to six hours per eight-hour day. They noted postural limitations and a need to avoid extreme cold, due to fibromyalgia and degenerative disc disease, but no other limitations. The ALJ relied upon this evidence to determine Ms. Noyes' residual functional capacity (RFC) for the time at issue.

Ms. Noyes asserts that the ALJ's decision should be reversed, and the case remanded for the payment of benefits, based on three errors by the ALJ: 1) rejecting the opinions of treating physicians Deodhar and Klos and the opinion of examining psychologist Richardson; 2) rejecting her own testimony; and 3) posing an incomplete hypothetical question to the VE.

1.  Did the ALJ err in rejecting the opinions of the treating physicians in favor of the opinions of the reviewing physicians?

28 - FINDINGS & RECOMMENDATION

Title II's implementing regulations distinguish among the opinions of three types of physicians: 1) those who treat the claimant; 2) those who examine, but do not treat; and 3) those who neither examine nor treat. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996); 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's and an examining physician's opinion carries more weight than a reviewing physician's. Holohan, 246 F.3d at 1202; Lester, 81 F.3d at 830; 20 C.F.R. § 404.1527(d). In addition, the regulations give more weight to opinions that are explained than to those that are not, Holohan, 246 F.3d at 1202; 20 C.F.R. § 404.1527(d), and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists, id. and § 404.1527(d)(5).[6]

Under Social Security regulations, if a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. Holohan, 246 F.3d at 1202; 20 C.F.R. § 404.1527(d)(2). An ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if the ALJ provides "specific and legitimate" reasons supported by substantial evidence in the record. Id. If a treating physician's opinion on the issue of disability is controverted, the

[6] Rheumatology is the relevant specialty for fibromyalgia. Benecke, 379 F.3d at n. 4. "Specialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community." Id.

29 - FINDINGS & RECOMMENDATION

ALJ must still provide "specific and legitimate" reasons in order to reject the treating physician's opinion. Id.

It is readily apparent that under these standards, the opinions of Doctors Jensen and Lahr, non-treating, non-examining physicians opining on diagnoses outside their specialties, start out being entitled to less weight than those of treating physicians Gandlin and Deodhar, rheumatologists, and Dr. Klos, a pain specialist. Several doctors commented on the need for records to review, many of which were never obtained and are not part of the record. While not clear, it appears Doctors Jensen and Lahr may have had more complete records to review. Their opinions do not make that clear.

The opinions of Doctors Jensen and Lahr are contradicted by those of the treating physicians. Their findings with respect to Ms. Noyes's ability to lift, sit, stand and walk are contradicted by the November 2002 opinion of Dr. Klos that Ms. Noyes cannot lift more than 10 pounds and must change position at least every 20 minutes. However, Dr. Klos expressed no conclusive opinion on Ms. Noyes's functional capacity. He says he has not tested her in that way. He recommends a full functional capacity evaluation and acknowledges he does not do them. Tr. 248. He does express the opinion that patients such as Ms. Noyes are often limited in the kinds of jobs they can do. Tr. 247. After saying this, he ventures into the area of functional capacity that he has acknowledged he doesn't work in and says recommending that a chronic pain patient return to work borders on official neglect. Id.

Doctors Jensen and Lahr's opinions on Ms. Noyes's physical capacity are "check the box" findings with little supporting

30 - FINDINGS & RECOMMENDATION

explanation.[7] See <u>Holohan</u>, 246 F.3d at 1207 (opinion of examining physician who examined claimant only once, and a reviewing physician who checked boxes without giving supporting explanations were insufficient to outweigh the opinion of a treating physician who cared for the claimant over a period of time and provided an opinion supported by explanation and treatment records). See also 20 C.F.R. §§ 404.1527(d)(2),(3)(weight to be given to medical opinions depends, among other things, on nature and length of treatment relationship, supportability, consistency, and specialization).

Doctors Jensen and Lahr checked a box to the effect that Ms. Noyes's reported symptoms were disproportionate to her underlying impairments. They cited to treatment notes dated May 2000 in which she told Dr. Deodhar she had walked on the beach and attended yoga, occupational therapy, and physical therapy classes, and to a questionnaire dated March 16, 2000, in which Ms. Noyes said that for the previous week, she was able occasionally to do laundry, vacuum a rug, prepare meals, and make beds, and able "most times" to do shopping, wash dishes by hand, walk several blocks, and visit friends or relatives, see tr. 193. Other notes in the record do support these statements.

There is no information in the record about the levels of exertion required for the yoga or therapy classes Ms. Noyes attended, the frequency of the classes, or the length of time she attended them. The questions on the March 16, 2000 questionnaire are limited to a single week. And finally, Doctors Jensen and Lahr

---

[7] What there is appears at Tr. 231-33.

31 - FINDINGS & RECOMMENDATION

failed to note that on that March 16, 2000 questionnaire, Ms. Noyes stated that during the same period of time for which she recorded various activities, she had been in very severe pain, very tired, very stiff, very anxious, and very depressed. Tr. 193.

I conclude that the ALJ failed to give the medical evidence its proper weight, failed to provide specific and legitimate reasons for rejecting the opinions of the treating physicians. However, the treating doctors' opinions do not establish Ms. Noyes's residual functional capacity.

2.   ALJ's rejection of Dr. Richardson's opinions

The ALJ rejected Dr. Richardson's diagnoses of major depressive disorder, anxiety disorder, and pain disorder. The ALJ also rejected Dr. Richardson's conclusion that Ms. Noyes's level of mood disturbance appeared severe enough to interfere with work, and his findings that Ms. Noyes had moderate restrictions in social functioning, and frequent episodes of deterioration in work and work-like settings. The ALJ accepted the opinion of non-treating, non-examining psychologist Dick Wimmers, Ph.D. and the opinion of Ms. Burckhardt that Ms. Noyes was capable of work-related activities. On the basis of these opinions, the ALJ found that Ms. Noyes's alleged symptoms during her insured period resulted in no more than mild limitations.

a. Dr. Wimmer's opinion

The ALJ is entitled to accept such a reviewing doctor's opinion over that of a treating or examining provider so long as the ALJ provides "specific and legitimate" reasons supported by substantial evidence in the record.

Dr. Wimmer's opinion consists of an "X" in a box labeled

32 - FINDINGS & RECOMMENDATION

"Affective Disorders" and the handwritten notation, "adjustment d/o with mixed emotional features." His opinion is not supported by reference to treatment notes, diagnostic tests, or clinical evaluations. His opinion is unexplained. These factors give the opinion very minimal evidentiary weight.

An analysis of the ALJ's stated reasons for rejecting Dr. Richardson's evaluation in favor of Dr. Wimmer's opinion are 1) "[a]lthough the claimant has reported several hospitalizations, as well as treatment with several counselors, there is very little evidence in this record of her seeking treatment;" 2) Dr. Richardson's opinions were rendered a year after Ms. Noyes's benefits eligibility ceased; 3) Dr. Richardson "relied primarily on claimant's subjective complaints;" 4) Dr. Richardson's assigned GAF of 30 seemed improbable; and 5) "it is clear from the record" that Ms. Noyes's depression stemmed from the breakup of a long-term relationship or relationships. Additionally, the ALJ rejected the March 2002 (some 18 months after Ms. Noyes's date last insured) statement of psychiatric nurse Munger that Ms. Noyes was unable to work because of chronic depression, in favor of evidence from Ms. Burckhardt, who evaluated and treated Ms. Noyes before and after her date last insured on a referral from another treating doctor, Dr. Deodhar. Ms. Burckhardt stated in February 2001 that Ms. Noyes was capable of work-related activities and had even said she was willing to return to work.

The ALJ's statement that there was "little evidence" of psychological treatment is puzzling. On one hand, most of the treatment mentioned in the record is undocumented by actual

records, and its source is only the reports of Ms. Noyes. [8] On the other hand, the record does show concerns by physicians about her psychological condition, referrals for treatment, and some counseling being given to her. The record documents that she had been treated with various antidepressant medications and counseled by Ms. Burckhardt from March 2000 until February 2001 and by Ms. Munger from December 2001 forward.

The ALJ's finding that Dr. Richardson's evaluation occurred a year after Ms. Noyes's benefits eligibility ceased is factually accurate. Dr. Richardson's conclusions about the probable onset and duration of Ms. Noyes's psychiatric impairments are entitled to little weight, since he saw her only once. However, Dr. Wimmer's conclusions about the duration of Ms. Noyes's psychiatric impairments are not entitled to much weight either. Both psychologists relied on Ms. Noyes's limited records and her reported history, undocumented by records, for their conclusions about the duration of her symptoms and their severity between April and September 2000. Dr. Richardson's opinions were supported by a developmental, educational, employment, medical, and substance abuse history from Ms. Noyes herself, in addition to the records, which repeat her reports to others, and psychological testing results. Dr. Wimmer's opinions were not supported by an in-person interview or testing.

The ALJ's finding that Dr. Richardson "relied primarily on claimant's subjective complaints" is not accurate. The evaluation shows that Dr. Richardson also relied on factors such as his own

---

[8] See history given to Ms. Rowland.

34 - FINDINGS & RECOMMENDATION

clinical observations and the results of psychological testing, which were found to be valid.

The ALJ rejected Dr. Richardson's assigned GAF of 30 because it seemed improbable and opined that it was "clear from the record" that Ms. Noyes's depression stemmed from the breakup of a long-term relationship or relationships. While that is one possible conclusion to reach, others more favorable to Ms. Noyes are suggested by the evidence as well.

Ms. Noyes's reported history shows a number of other precipitating psychological and situational factors, including frequently-absent parents, verbal abuse by her mother, estrangement from her mother during adulthood, problems with learning in school, conflict between her parents during childhood, two failed marriages, the death of father, grandfather, and grandmother who were, according to Ms. Burckhardt's treatment notes, "parents to her," the death of her son in a car accident, and the moving away of a daughter who was "very close," see Tr. 190. It is worth noting that not only did these potential precipitating events occur over several years, but her reportedly worst episodes were well in the past with no record developed to support the treatment. The record here cries out for better development of Ms. Noyes's psychological problems and treatment over time. A history of four hospitalizations, three within this state, and years of treatment and complaints, with no records to document the history leaves nearly everyone in the position of a reviewing doctor, with no records to review, only plaintiff's oral history. The ALJ should develop this record to either support his conclusions or Ms. Noyes's contentions. Remand is appropriate.

35 - FINDINGS & RECOMMENDATION

1              b. Carol Burckhardt's opinion

2         The ALJ relied on the opinion of nurse practitioner Burckhardt

3    that Ms. Noyes was capable of work-related activities. Social

4    Security regulations which govern the weight to be accorded to

5    medical opinions provide that nurses and nurse practitioners are

6    not "acceptable medical sources." See Gomez v. Chater, 74 F.3d 967

7    (9th Cir. 1996). I know of no case addressing this issue where the

8    nurse practitioner has obtained a Ph.D. that, coupled with the

9    referral to her by Dr. Deodhar, a specialist in rheumatology for

10   mental health issues, entitles her opinions to more weight than

11   usual. Nonetheless, remand for record development is appropriate

12   here.

13        2.   ALJ's rejection of Ms. Noyes's testimony

14        The ALJ is responsible for determining credibility and for

15   resolving conflicts in medical testimony. Andrews, 53 F.3d at 1039.

16   However, the ALJ's findings must be supported by specific, cogent

17   reasons. Reddick, 157 F.3d at 722. Unless there is affirmative

18   evidence showing that the claimant is malingering, the

19   Commissioner's reasons for rejecting the claimant's testimony must

20   be "clear and convincing." Id. The ALJ must identify what testimony

21   is not credible and what evidence undermines the claimant's

22   complaints. Id. The evidence upon which the ALJ relies must be

23   substantial. Id. at 724. See also Holohan, 246 F.3d at 1208 (same).

24        The ALJ discounted Ms. Noyes's testimony because 1) her

25   statements were not entirely credible "in light of the medical and

26   treatment reports of record;" 2) there were "several references in

27   the record" indicating that Ms. Noyes was looking for work and

28   willing to work, such as her statement to Ms. Burckhardt in October

36 - FINDINGS & RECOMMENDATION

2000 that she had been doing temp agency testing was worried about finding a job, and that she was able to motivate herself to job hunt; her statement on October 23, 2000, that she had been working with Vocational Rehabilitation in an effort to find work and had applied at temporary agencies; Dr. Klos's statement that "although she reported having a lot of pain, she was still looking for work;" and Ms. Noyes's statement on April 24, 2001, that she had started a job doing payroll and bookkeeping, working 16 hours a week; 3) a treatment note from Dr. Klos in July 2000 indicated that Ms. Noyes had gone to Hawaii to house-sit for five weeks and had other evidence of her daily activities in Hawaii; and 4)a vocational progress report dated March 2001 that Ms. Noyes was "being selective" about the types of jobs for which she was willing to apply, because she was seeking part time work for approximately 30 hours a week. Tr. 74.

Findings based on the record as a whole, or the record in general, are insufficient to support an adverse credibility determination. See, e.g., Reddick 157 F.3d at 722; Holohan, 246 F.3d at 1208. The ALJ's finding 1) above that Ms. Noyes is not entirely credible "in light of the medical and treatment reports of record" is inadequate.

Ms. Noyes' statements that she was looking for part-time work, that she was willing to work part-time, or that she was attempting to work part-time do not constitute admissions that she is able to work full-time. However, they are seemingly inconsistent with her claimed level of disability.

The ALJ also based his credibility findings on a statement made in a report from Workplace Dynamics, on March 30, 2001, in

37 - FINDINGS & RECOMMENDATION

which the consultant said the following:

> Michelle is being selective about the types of jobs for which she is willing to apply. She is seeking part-time, approximately 30 hours a week, and would like to work in a creative artistic environment and preferably would like to earn a minimum of $10.00 per hour.

Tr. 74. This statement is rather ambiguous, and could be interpreted to mean that Ms. Noyes is simply expressing personal preferences, or that she would refuse to work at a job that did not meet these requirements. If the ALJ inferred that Ms. Noyes was unwilling to work, that inference is not supported by the other evidence from Workplace Dynamics. It shows that during the six weeks that Ms. Noyes used Workplace Dynamics' services, she applied for jobs as a floral designer, a receptionist at a chiropractic clinic, and an at-home data entry person, and that she worked for Goodwill as a typist, in a clerical position for National Relief Charities, and as a film extra.

The ALJ disbelieved Ms. Noyes's testimony because of evidence that she house-sat in Hawaii for five weeks, Tr. 199, and walked on the beach for exercise. However, this evidence is insufficient to meet the requisite clear and convincing standard.

The issue before the ALJ was whether the evidence of Ms. Noyes's daily activities indicated a frequency, duration, and level of physical exertion that contradicted her testimony. Unfortunately, the record does not contain sufficient detail on these tasks to enable the ALJ or the court to determine that Ms. Noyes's level of activity clearly and convincingly contradicted her testimony. There is no indication that house-sitting required Ms. Noyes to engage in significant daily exertion. Ms. Noyes testified at the hearing that her walks on the beach were less than half a

38 - FINDINGS & RECOMMENDATION

mile, and perhaps less than a quarter mile. See tr. 305. The evidence does not reveal the kind of yoga Ms. Noyes was doing or the frequency with which she did it, whether she was doing small or large loads of laundry, at home or in a laundromat, vacuuming an entire house or a few rooms, shopping for hours at a time or for short periods. Since I am recommending remand, it would be appropriate to obtain some of these details.

I conclude that the ALJ's credibility findings are troubling. They should be reevaluated with the more fully developed record on remand.

3.   Did ALJ err by failing to include all of Ms. Noyes's impairments in the hypothetical question to the VE?

The testimony of a VE is valuable only to the extent that the hypothetical question posed by the ALJ accurately depicts the claimant's individual physical and mental impairments. <u>Irwin v. Shalala</u>, 840 F. Supp. 751 (D. Or. 1993). When the hypothetical is incomplete, the VE's testimony does not constitute competent evidence to support a finding that the claimant can do the jobs described by the VE. <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1466, n. 3. (9th Cir. 1996); <u>Varney v. Secretary</u>, 846 F.2d 581, 585 (9th Cir. 1988)(vocational expert's response to incomplete hypothetical has "no evidentiary value").

The ALJ must propose a hypothetical to the VE that is based on medical assumptions supported by substantial evidence reflecting each of the claimant's limitations. <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1163 (9th Cir. 2001).

The ALJ specifically found that Ms. Noyes had fibromyalgia and osteoarthritis. These are conditions whose symptoms include pain,

and there is substantial evidence in the record that Ms. Noyes experiences pain from them. However, the ALJ's hypothetical to the VE took no account of pain, particularly the pain and restricted range of motion that Dr. Klos found in Ms. Noyes's cervical spine. See Cooper v. Sullivan, 880 F.2d 1152, 1158 n. 13 (9th Cir. 1989)(VE's testimony does not constitute substantial evidence to support ALJ's determination on claimant's disability status unless it accurately reflects all of the claimant's limitations, including pain); Russell v. Sullivan, 930 F.2d 1443 (9th Cir. 1991)(hypothetical to VE which failed to mention claimant's testimony that physical pain prevented him from sitting forward for more than 20 minutes at a time, and uncontroverted opinion of claimant's treating doctors that he could not sit for long periods, deprived VE's testimony of any evidentiary value).

The symptoms of fibromyalgia include fatigue, but the ALJ also neglected to include this impairment in the hypothetical to the VE.

The ALJ specifically found that Ms. Noyes had moderate limitations in concentration. Tr. 25. Because the ALJ's more restricted hypothetical to the VE did not include the limitation of moderately impaired ability to concentrate, the VE's opinion in response lacks evidentiary value.

The VE's testimony is insufficient to support the ALJ's finding that Ms. Noyes could return to her past relevant work as a general office clerk. On the properly developed record on remand, an appropriate question must be posed to the VE.

4. Should the court remand for the payment of benefits?

Sentence four and sentence six of 42 U.S.C. § 405(g) provide:

The court shall have the power to enter, upon the

40 - FINDINGS & RECOMMENDATION

pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing...

The court may, on motion of the Secretary made for good cause shown before he files his answer, remand the case to the Secretary for further action by the Secretary, and it may at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Secretary shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm his findings of fact or his decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based.

In Melkonyan v. Sullivan, 501 U.S. 89, 101-03 (1991), the Supreme Court held that sentences four and six prescribe the only two kinds of remands allowed under section 405(g). In a sentence four remand, the court rules on whether the Secretary properly considered the claimant's application for benefits. Flores v. Shalala, 49 F.3d 562, 568 (9th Cir. 1995). Under sentence six, by contrast, the court may remand without making a determination as to the "correctness of the Secretary's decision." Id., quoting Melkonyan, 501 U.S. at 100.

The decision whether to remand for further proceedings turns upon the likely utility of such proceedings. Harman, 211 F.3d at 1179. Whether to remand under sentence four is a matter of judicial discretion. Id. at 1177. A remand for further proceedings is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits. Holohan, 246 F.3d at 1210. The rule recognizes "the importance of expediting disability claims." Holohan, 246 F.3d at 1210. In cases in which it is evident from the record that benefits should be awarded, remanding for further proceedings would needlessly delay

effectuating the primary purpose of the Social Security Act–i.e.,
to give financial assistance to disabled persons because they
cannot sustain themselves. Id.

In Smolen, 80 F.3d at 1292, the court held that improperly
rejected evidence should be credited and an immediate award of
benefits be made when: 1) the ALJ has failed to provide legally
sufficient reasons for rejecting such evidence, 2) there are no
outstanding issues that must be resolved before a determination of
disability can be made, and 3) it is clear from the record that the
ALJ would be required to find the claimant disabled were such
evidence credited.

If the Smolen test is satisfied, then remand for payment of
benefits is warranted regardless of whether the ALJ *might* have
articulated a justification for rejecting evidence that was
improperly rejected. Harman, 211 F.3d at 1173 (emphasis in
original). See also Benecke, 379 F.3d at 595(applying the three
factors and also holding that in the unusual case in which it is
clear from the record that the claimant is unable to perform
gainful employment in the national economy, even though the
vocational expert did not address the precise work limitations
established by the improperly discredited testimony, remand for an
immediate award of benefits is appropriate).

I conclude that the Smolen test is not satisfied in this case.
I recommend remanding the case for the development of a proper
record and decision by the ALJ.

## Scheduling Order

The above Findings and Recommendation will be referred to a
United States District Judge for review. Objections, if any, are

42 - FINDINGS & RECOMMENDATION

due March 11, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due March 25, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 25th   day of  February 2005.


                                        /s/ Dennis J. Hubel

                              _____
                                        Dennis J. Hubel
                              United States Magistrate Judge

43 - FINDINGS & RECOMMENDATION